Our third division is now in session. Counsel Justice Marianne Mason is presiding. Please have a seat. Good morning. Would you call the first case please? 1428.7 James Crowley v. Wayne Watson Counsel, please approach. Good morning, Your Honor. For the defendants' appellants, Mike Breese is from Smith Advocacy. Good morning, Your Honor. For the plaintiffs' appellees, Anthony Pinelli. All right. You are the only game in town today. And we will be liberal with affording you time to present your arguments. We have read the briefs. We're very familiar with your case. I would ask you to speak into the microphone but let you know that it's not for amplification. It's for recording purposes. So please keep your voice up so everyone in the courtroom can hear you. With that, Mr. Reeses. Good morning, and may it please the Court, Counsel. My name is Mike Reeses and I'm here today on behalf of the appellants. We've raised a number of issues on appeal. This morning, in the interest of time, we want to focus on two of the most important. First, whether a plaintiff can recover under the State Ethics Act after defendants terminated his employment. And second, whether the Act authorized the $2 million in punitive damages awarded against Chicago State University. If we are correct on the first issue, we are entitled to judgment on appeal. If we are correct on the second issue, the $2 million punitive damage award must be vacated. Either way, the $3.5 million judgment cannot stand. First, plaintiff's claim was barred because in-house counsel cannot sue for retaliatory discharge. According to the third amended complaint, plaintiff was hired as Associate General Counsel in September 2000, and he was promoted to Senior Legal Counsel in July 2009. His, quote, legal duties, close quote, and that phrase is in the third amended complaint, included contract review and responding to FOIA requests. Those allegations in paragraph 6 and 30 of the third amended complaint are judicial admissions. We submit his claim is barred pursuant to Bala v. Gambrow. Was the word Bala ever uttered in the trial court? Absolutely. It was, first of all, your honor, it would have been raised in our motion eliminating number 32 before trial. Number two, it was raised as soon as it could be after verdict in our motion for judgment notwithstanding the verdict. Tell us about motion eliminating number 32. Motion eliminating number 32 sought to bar the disclosure of any attorney-client communications that the plaintiff had with us as his employer. What do you mean attorney-client communications? I'm sorry? Give me a specific attorney-client communication. Well, I suppose, your honor, if Mr. Crowley was reviewing contracts and was of the opinion that a contract violated the procurement code and was reviewing that contract in-house for his employer, that would have been part of his legal duties pursuant to the attorney-client motion. As you know, in your opponent's brief, it clearly shows many cases where you've indicated he does not work in a legal capacity. He has a second job over at the Jones Convocation Center in an administrative role as an assistant vice president, but when he's reviewing contracts and applying the law of the procurement code, he's a lawyer. Well, he was specifically terminated from his administrative position, right? He was terminated from employment and the title was assistant. Right. But he also had for alleged irregularities in connection with his performance of the duties of that position, not as a lawyer. Correct.  He was still performing the contract review. And under BALA, what's important is, and remember, BALA is a case where the in-house lawyer served in more than one capacity. Yeah, but that was primary. This is secondary. I believe, your honor, that if BALA... If you read the ABA statement carefully, his duties were secondary, not primary. But the point of BALA is, whether it's primary or secondary, if he acquires the information where he's acting as a lawyer and is acting in that capacity, then under the rules of professional responsibility, he has certain obligations. So what specific things did he acquire that were not already disclosed under the FOIA and also were not secondarily disclosed to him by other parts of the college? Well, he would have... When did he specifically first deal with something and not secondarily deal with it? Well, he would have been dealing with the contract review in 2000... What contract review? The review of three specific contracts that dealt with... I believe it was public relations was one. Another one was involving the use of banners. There was a concern that the contracts were being kept under a certain threshold value of $25,000 for streaming. I think that is the phrase. There were issues concerning possible violations of the procurement code. And he's not doing that as an assistant vice president over at the Convocation Center. Here's the issue, though. Let's say we'll agree with you for the moment that despite what was in the termination letter, they fired him because he was going to rat him out on the FOIA request. What was the case defended on? The case was defended on by calling him a thief. The case was defended by calling him somebody who had an inappropriate relationship with a student employee. It was all about what he did at the JCCC. Why should we reward you on appeal now when counsel at trial specifically waived this issue, forfeited this issue, and completely abandoned it at trial as any defense? Your Honor, if there is no cause of action, there's no cause of action. And it's not based on the facts, okay? If the law does not recognize a recovery, that can be raised at any point. The failure to state a cause of action can be raised at any time. And if there's no cause of action... No cause of action can be if you're saying that there's no general validity to the retaliatory discharge under the Ethics Act as a cause of action. That's why I'm not saying that. What you're saying is that we have an affirmative defense to it. Again, waived. Where's the affirmative defense here? There is no affirmative defense. We're denying... Well, there could have been. I don't think it's an affirmative defense. Ballatin treated it as an affirmative defense. It's not an affirmative defense. It goes to the issue of whether or not you can state a cause of action. An affirmative defense is not that something doesn't state a cause of action. All right? But... It defeats it. The Ethics Act establishes this cause of action, which is what the plaintiff pled. That's right. Your defense, which I don't see in the record, was that he's accepted from this cause of action because of the position he holds. He's an attorney. I never saw that defense raised. Your Honor, if he does not have a cause of action, okay, if the Illinois rules of professional responsibility do not allow him to sue for termination because the rules require that he withdraw from representation after we fire him, that can be raised at any time. That is independent of facts. Where is that motion? Where is all that motion practice in the record? Where you file a motion to dismiss, you file a motion for summary judgment, because the duties that he was performing that caused his termination are a question of fact. Your Honor, I think that in light of what appears in the third amendment complaint, and if you do look at the record, there's no question that when he is reviewing contracts and when he is making a determination that certain contracts are illegal, he is performing a legal duty. It doesn't matter if it's primary, secondary. The fact that he's acquiring the information and he is going to the AG's office with it was information that he acquired through the AG's relationship. That's the way Ballot was defended. Trial counsel didn't defend this case that way. They walked away from it. They tried to stick onto their theme that, you know, this guy, he's stealing a little bit of money here, $200 for a parking pass, next thing you know it's a half a million dollars. Your Honor, I want to make it clear. We disputed that the conduct took place and we disputed whether retaliation took place. You're right. And now, under Pedrick, we get to ask the court to view the record in a light most favorable to the plaintiff and determine whether there was a question of fact, okay, that allowed him to recover. One possible question of fact would be, as I think I'm hearing this morning, that he really wasn't a lawyer when he acquired this information and went to the AG's office or when he threatened to go to the AG's office if certain practices continued. That would be a question of fact, except it's not disputed here that he acquired this information as a lawyer. The Third Amendment complaint says he is senior legal counsel, he has legal duties, and those duties, which are admissions, involve review of contracts and involved in the review of contracts to determine whether or not they are legal and compliant with the procurement code. He went as a whistleblower. You're right. He said they violated the procurement code. He's a lawyer. He's not determining then if Pesky's legal or not legal counsel, even if we accept that. We'd have to look an awful long time to try to find some law or some articles out there in trial practice that this is the best way to preserve this kind of error for appeal. Your Honor, all I can say is that, yes, it could have been raised earlier. I'm not going to deny that it could have been raised earlier. But if we're talking about whether a cause of action could ever be maintained, that can be raised at any time. I don't actually think you're saying that. I think you're saying that there's an affirmative defense, that you have an affirmative defense in that cause of action, and even that wasn't raised. Your Honor, no case, not Bala, not Jacobson, no case has ever treated it as an affirmative defense. It is not an affirmative defense to say it fails to state a cause of action. You want to talk about a motion to dismiss that could have been made? It could have been made under 2615. It was made under 2615. That is before the affirmative defense was even planned. So it's not an affirmative defense. And I didn't hear the plaintiff argue that it was an affirmative defense. So it's not that. Your Honor, I'm going to go back to the earlier issue. Yes, there is a second issue here, and that is whether or not the Ethics Act allows for an award of $2 million in punitive damages. Section 15-25 does not expressly refer to punitive damages among the enumerated remedies. It refers to, quote, all remedies necessary to make the employee whole, close quote, which refers to compensatory, and to, quote, prevent future violations, close quote. And that does speak to the issue of determinants. The remedies include, but are not limited to, reinstatement, double back pay, which we believe is a penalty, a statutory multiplier, interest on back pay, reinstatement, and attorney fees. When did they object? Trial counsel. When did your trial counsel object to the possibility of getting the award? Didn't object. Didn't object. And you know what, Your Honor? They want another life preserver? He didn't have to object on this issue, okay? Number one, we're talking about, well, number one, the judge had made up his mind because he was relying on Mays, the federal court decision. He said on the record he's relying on Mays, where Judge Moran, so in response he said the punitive damages could be recovered. And trial counsel was what, mute? And the objection would have been unavailing, and there is an exception where the objection would have been futile. And as further proof of that, we did raise it after the verdict. In what context did the trial judge say she was relying on Mays? In what context was that stated? We're going over at the jury instruction conference. Okay. And the judge was going over the verdict form. Before jury instructions. Yes. Before we get to jury instructions, all the evidence is in. ABLE trial counsel, ABLE defense counsel never once said, you know what, Judge? Punitive damages aren't available under this statute. Right. Never said that. Never said it. Never said it. But you know what, Your Honor? It doesn't matter because we're talking here, one, about a question of law. It didn't depend. You know, if you want to say that the first issue depends on trial strategy and the facts and the proofs, I get that. But this question about punitive damages and whether the act authorizes it doesn't depend on what Mr. Pinelli did or didn't do. It has nothing to do with the proofs. It has nothing to do with the strategy.  It's a question of law. Secondly, we're talking about sovereign immunity. We're talking about whether or not the state is liable. And the rule is when it comes to sovereign immunity, if you waive it, it has to be clear, it has to be unequivocal, it has to be affirmative, and it is remedy specific. And when the state says including but not limited to a laundry list of remedies and specifically recites that those remedies are designed to prevent future violations, how do you not include punitive damages? Because you already have a multiplier. You have double back pay. And you can't have both without running afoul of another. How do you respond to counsel's argument on that? What, about the double back pay? Yeah. He gets double back pay. 480 was the compensatory. 480 had to be for something other than compensatory. No, I said their argument. Yeah. In opposition to yours.  Theirs seems more logical in light of May's. Well, in May's, you're talking about a federal decision that allowed for punitive damages against an individual actor. Right. Not against the state. Not against a state employee in an official capacity. That's number one. Number two, if you look at the statute. When you say a state employee in an official capacity. Yeah. Dr. Watson wasn't working at the time of this. He was not an employee of CSU at the time of the conduct alleged in the complaint. Correct? Correct. So he's not acting within the scope of his employment, clearly, because he hadn't started yet. And was there anything that prevented CSU from turning to him and saying, you know what? If we get tagged for punitive damages, we're going to be looking to you personally to pay that. Is there anything that prevented them from doing that? That would not be in the record. But what I can tell you is that the award was entered only against the state entity. All right? And that was a choice of counsel. He was the one who made that decision. It had nothing to do with what we did or what we did or did not do vis-a-vis Mr. Watson. One other thing about Mays, I want to say before I get off this point. The statute talks about how the circuit courts of this state have jurisdiction. Mays is a federal decision. Mays didn't even have subject matter jurisdiction to make that decision. And there is, I believe, if you look at this statute, a subsequent federal decision that said it didn't have jurisdiction. So what we have here is we have a judge who relied on a case that wasn't applicable and didn't even have subject matter jurisdiction over the case. Do you have a citation for that subsequent case? I can certainly provide that citation, Your Honor. It's in the annotations, but I will be happy to supply that after the oral argument. I know that the court is bothered by the fact that no objection was made. Let's put that aside. I do want to put that aside. But the point I'm trying to emphasize here is that if the statute does not authorize the damages, I don't think that issue could ever be waived. Because then the immunity attaches, and sovereign immunity means that there is no subject matter jurisdiction. Wasn't the sovereign immunity statute amended after the Ethics Act came into being? And yes, and it does allow for suits to be brought against the state under the Ethics Act. Right. That's the waiver. But the waiver has to be remedy specific. So, for example, if the state doesn't waive its liability with regard to or its immunity with respect to costs, if it doesn't waive its liability for that, you can't imply it or read it into the Act. Or in another case, I think we cited it related to interest, and the court said in that case the state didn't waive its right to not be liable for interest. And all we're saying here with regard to punitive damages is that once you have a multiplier, and that multiplier is clearly doubling the back pay, that's the deterrence. Why else would you enact a multiplier? All right. I mean, that is front and center. If you compare this statute with the whistleblower statute, a private whistleblower statute, okay, that statute doesn't refer to double back pay. It also doesn't refer to allowing for damages that deter future violations. The point is that the General Assembly, at the same legislative session in 2003, creates two statutes. In one case, against the state, it allows for doubling back pay, and it also uses the language deterring future violations. In the private whistleblower statute, it doesn't have double back pay, and it doesn't allow for, doesn't provide for deterrence of future violations. What is the point of authorizing an award of double back pay if not to meet that objective of deterring future violations? And if you did have both, isn't there a rule against double recovery for the same conduct? That's in tort actions. That, well, I was under the impression that this was a tort claim. I'm curious to hear you articulate the argument that since the Ethics Act is relatively new, there haven't been that many cases. Let's not whack the first guy with punitive damages. Let's let that go. Let's not whack the state. Let's not whack the state. Exactly. The taxpayer and the college students who would have to pay this award. Right. Okay? Because that's what we're talking about here. And in a time, I don't think I have to remind the court about the financial state of public universities coming. Let's not play games here. Stick to the case. I am sticking to the case. We have an amicus brief that was filed by the State University. Stick to the case. I will. Okay. Fair enough. If there are no other questions, I think I will reserve rebuttal. Mr. Pinelli? Good morning again. May it please the court, counsel? Your Honor, with respect to Bala v. Gamro, the Supreme Court's decision in that case drilled right down to the question of privilege. In that case, when the Supreme Court decided not only what the policy issue was about in-house attorneys suing, they took a look at that case and said it should have gone out on summary judgment because there was testimony at the deposition by Bala that when I decided that these dialyzer devices were something that happened to them or they didn't work, and I told the president of the company, if you sell these, I'm going to have to report this. When I did that, I used my legal knowledge to reach a legal conclusion as a general counsel, and then he had a secondary job as a regulator. So what knowledge was your client using when he said we have to give all this info under FOIA? When my client looked at the FOIA requests, that was his job, and it's not legal work. He had prepared already the requests and materials he was going to turn over to Dr. Philip Beverley, which included these contracts for public relations. Why is that not legal work? Isn't he trying to decide what should or should not be disclosed pursuant to a statute? Well, in making a decision, yes, he should have somehow read the law, but as the general counsel for Chicago State testified, they don't have a lawyer do that anymore. They have a FOIA officer. So it could be interpreted in law, but I respectfully don't believe he needs his law license to do that work. But at any rate, with respect to this case, we called an investigator from the attorney general's office. He testified that Crowley gave him a note when he talked to him. The note says on it, FOIA threat. That's what he went to talk about. The documents that Dr. Philip Beverley got in FOIA, which he brought and turned over, were not privileged because Dr. Beverley got them, and rightfully so under FOIA. They're not privileged documents. There's nothing privileged about them. So there was no attorney-client privilege there. My client went to the meeting, which no one could testify who called the meeting. No one could testify why the meeting happened. My client got a call from the president's secretary-to-be to go to the president's office. When he got there, he found Sandra Westbrooks, the provost, and Wayne Watson, who was not only not yet the president, but who had been testifying before the state university retirement system, that I'm not going to start until October 1st. I have performed no official duties at Chicago State University. I don't do anything there until after October 1st so I can start my pension October 1st. Watson starts talking with him about what he's going to turn over. Watson's not a client. Watson's got no standing to talk about it, and as noted in the footnote by the trial court, what is Watson doing there reviewing FOIA requests about him at that point in time? That question had never been answered by any of the evidence in the case. In the course of that, he's threatened. A hand is placed on him, and he's told, if you do it my way, you'll be my friend. If you do it your way, you'll be my enemy. He reported that as a threat. I believe most people listening to it would think it's a threat. I think the jury concluded it was a threat here. So unlike Bala, there's no attorney-client privilege at the very heart of the reason why Bala wasn't allowed to sue. What about the defendant's argument regarding the judicial admissions? They say the complaint pleads he was a lawyer, that he was acting as a lawyer, and then in connection with his duties, he made these FOIA determinations, which later formed the basis of his termination. We said in the complaint what Crowley's duties were at each stage of his career, trying to give some facts as to what he did. He was hired as a lawyer in 2000. In 2008, his title changed somewhat in his responsibilities. And by the time he got to 2009, he was working at the Convocation Center. Now, we didn't litigate this issue. If they had raised it, we would have. But plenty of witnesses testified to what kind of work he did. All the witnesses who testified that he worked for or worked for him, Sandra Westbrooks, Jawan Irvin, Melvin Morris, Jerome Jackson, all testified that they were mailing documents, copying documents, running the not-for-profit centers, business centers that the university was operating, and they answered to Crowley. He was supervising them. He was in the Convocation Center. The audit report, which is the basis for his termination, establishes that for that year period that was audited, that he did nothing but that. That's the only thing that John Meehan talked about. And although Meehan's audit report was spawned into the reasons for the discharge, Meehan's testimony before the jury was Crowley did a good job. He was the first person to straighten up the Convocation Center. So the record was full of, and we didn't really spin it ourselves because they didn't raise the issue. Had they asked him, he would have said, I didn't do any legal work during that period of time. But the question never came up during the trial until post-trial motions. So respectively, I believe both on the facts that the jury heard in this case, they would have been correct in concluding that he was not working as a lawyer. And then if you add to that, that in the termination letter they called him, you are terminated as the Assistant Vice President of the Convocation Center. That was before the trial.  No issues raised as to his duties. Then after the trial, the jury orders, specifically checks, yes on the box for reinstatement. And then the judge orders as part of the judgment that he be reinstated and asks Chicago State to file a position statement with the court, which I think is really a judicial admission. And in that position statement, which we say in our briefing and is in the record, they said, that job is gone. The job as Associate Vice President of the Convocation Center, that job is gone. There's no talk about lawyers or doing legal work in that. So before going and after the trial, Chicago State takes the position and the evidence bears out that he wasn't working as a lawyer at that time, respectively. Final comment on Gamboa is that this is a claim brought under a statute passed by the legislature. Gamboa distinguished the Massachusetts case, which I'm sorry I'm about to blank on, but there was considered a decision by the Massachusetts Supreme Court discussed in Gamboa. And in that case, the court said, well, you know what? There they let a lawyer go ahead with a retaliatory discharge because it was brought under a whistleblower statute passed by the legislature. And the legislature knows what the reality is of attorney-client privilege that goes on in government and goes on in business. But the legislature said it was okay for a lawyer to sue under that whistleblower statute. Respectively, here the legislature passed an act for employees of the state of Illinois. I don't know how many, but my guess is a lot of lawyers work for the state of Illinois in a lot of different capacities. And I don't believe that the state takes the position that they're excluded from the Ethics Act anywhere. So, respectively... What significance do you draw between, regarding the difference between the language and the Ethics Act for government employees and the private ethics? In the private sector, I believe that there were probably organizations and the comments indicate that there was lobbying from the Chamber of Commerce and others with respect to the whistleblower statute to restrict the damages. Among other issues in that case, that we shouldn't even have a whistleblower statute. So, I think that for the legislature to do it here, the difference, I think, comes down to they gave some folks a remedy in the whistleblower statute but the only quote that I could find in the legislative history here, I don't think you need it because it's not ambiguous language, but in the legislative history, there's a quote from the sponsor of the bill who says, what we need to understand is we need to pass a very comprehensive, tough ethics bill that sends a message to the people of Illinois that we get it. Isn't doubling the back pay tough enough? I mean, if you look at the cases on punitive damages, if they come back with an award of twice as much punitive as compensatory, that's viewed as being appropriate. Why shouldn't we accept their argument that the doubling is a built-in punitive damage? Because I believe that you can recognize within an award that says two times a couple of things. One, in the Harris case, and that's triple, I understand that, but the court commented that they may have tripled the damages so that lawyers would be interested in taking the cases. That's a possible reason for doubling the amount or putting a multiplier in. I believe, we cited to the federal statute, which I know is just suggestive authority, but under the Fair Labor Standards Act, when an employee assumes because the employer doesn't pay them, they get doubled the amount. And it's not considered punitive damages. It's considered to make them whole for the value of the money. There's a value to losing your income. There's a value to that. In this case, Mr. Crowley testified, what did you live on? I took out my 401K. Not from a practical standpoint. You know, he was given here double back pay. He was also given prejudgment interest. Also given attorney's fees. So it seems like, you know, if you want to talk about compensatory or even over-compensatory, I think an argument might be made that, you know, it was built into the statute itself. And I think an argument might be made that that was done to recognize the fact that just giving somebody back pay doesn't allow them to make up the damages that they suffered in that circumstance. I've had arbitration cases where people have testified, I spent my son's college fund. So they get back pay. That's all an arbitrator can give them. Now, after they pay taxes, they're not going to be able to put the money back. That money's gone. Things happen when you take actions in people's lives that create damages. So if you doubled it so that they would get the value of the money as well as the money, I don't know why that would be necessarily piling on in that circumstance. You know, your colleague didn't address remitted or might get to it a little bit in rebuttal, but what did you suggest to the jury in terms of the amount that they should award for punitive damages? Well, I'm embarrassed to tell you that first I forgot to ask for an amount of punitive damages. I mean, you came pretty close to waiving it yourself, didn't you? Came pretty close. As far as the bench before it dawned on me. But I didn't consider or ask for a specific dollar amount. I referred to some of the reports we had talked about and evidence of the audit findings and the amounts of audit findings in excess of a million dollars that had been found there. And I said to them, what you need to find is an amount which will make them take this seriously. And I left the question in the jury's hands at that point in time. I did not ask for a specific amount, but as I wrote in the brief, I think here if the compensatory damages are a million and $20,000, and a reward of $2 million, I couldn't find any other Supreme Court cases or appellate court cases that said that a remitter was appropriate in that case. I have seen that there were some that were reversed where 8, 9, 10 times it may have been excessive, but nothing where a doubling of the compensatory damages was considered excessive. So that's why we believe that a remitter would not be appropriate in this case. Anybody have anything else? No, I will rely on our brief as to the other issues and I appreciate the time this morning. All right, thank you. I'll start with the punitive damages first. A couple things. First, counsel said the compensatory damages were $1,020,000. Well, $480,000 of that is back pay. The other $480,000, what does that represent? It's not the incentive for the lawyer to take the case because the lawyer got over $300,000 in attorney's fees. It's not for the loss of the use of the money. He got prejudgment interest. Was the prejudgment interest actually defined? Was there a number put on it? Yes, the prejudgment interest is, I believe, $60,000. It's 5% of $40,000. And how many years was it between the termination and the time of the jury's verdict? It still hasn't been paid, right? Well, that gets to post-judgment efforts, but it's 2010 to 2014. He's terminated February of 2010. The verdict comes back February of 2014. So we have four years of interest. Of no income. And Mr. Pinelli makes a point that there are collateral consequences to no income. If somebody tells you four years later, okay, you should have been paid and I'll give you your income plus interest, there are collateral consequences that that doesn't make up for, such as cashing in your 401K. But my point, Your Honor, is that the 480, the extra 480, okay, is a multiplier. And the multiplier is deemed to be punitive. It's supposed to deter because it doesn't cover the other elements of damages. Counsel referred to a federal statute that refers to doubling, but there the statute specifically said it was supposed to be liquidated, okay? This statute doesn't refer to doubling back pay as liquidated. However, the General Assembly did use that phrase, doubling, with regard to the Equal Payment Act of 2003, coincidentally enacted at the same session. So the General Assembly in one statute refers to the doubling as liquidated, but not in this case. Under this statute, it did not refer to it as liquidated. So I think there's an obvious conclusion to be drawn there that it has to be for something that is not compensatory and the only thing left is to deter future violations. You know, I asked you before, and maybe we were whacking you too hard for you to get the response out, but I did ask you before to give us your articulation of the argument that, you know, this is a new act and we shouldn't be putting a judicial stamp of approval on a punitive damage verdict given its, quote, novelty. Well, exactly, Your Honor. I mean, we have a statute that has had very little attention from the court since it was passed in 2010. If we're talking about punitive damages, which is I think what you're talking about, we're talking about a question of law, a question that's going to recur, and I think it would be very harsh. You know, waiver is a limitation on the parties. It's never a limitation on the court. The court can always address the issue when it's important to maintain a uniform and coherent body of precedent, and that's what's uppermost here, not whether trial counsel, you know. Punitive damages aren't appropriate in this case where the jury found a specific threat against Mr. Crowley and his termination directly related to that threat carried it out. When would it ever be appropriate? If the legislature intended it to be enacted, but I'm not making a factual argument, I'm making a legal argument, that the legislature did not intend to stick it to the state to award punitive damages against the state without actually expressly referring to punitive damages anywhere in the statute, but did refer to a multiplier, which we believe is the deterrent and accomplishes the statutory objective. But I take your point. I'm not up here, look, I don't mind being whacked because I have to sometimes, you know, make the argument, but I really believe in this case there is nothing in this statute that says that the state will be held liable for punitive damages. I mean, this is clearly a statute, if that interpretation went forward, it would be without precedent. You wouldn't get punitive damages against a local public entity. You couldn't impose it against the state in the court of claims, and it does constitute a double recovery for the same conduct. But there's no question it is for the same conduct that has been prohibited in any of a number of Illinois cases. But before I sit down and rebuttal a couple of other things I want to say, though, about Bala, Justice Mason referred to what was alleged in the Third Amendment complaint, and I do want to point out to the court in Paragraph 6, plaintiff alleged his duties as senior legal counsel included review of contracts and Freedom of Information Act requests. And that's specifically the conduct that was at issue. And it was the information that he acquired in that role that he took to the AG's office in September of 2009. He wasn't acting as the AVP at that time. And I understand what you're saying about how this should have been raised and could have been raised earlier. I just think you'd be in perhaps a stronger position than the more or less one you're standing in now. Well, you know, Your Honor, sometimes you have to simply go with what the record is. But this record does have it as far as Bala's concern and the considerations that led the court to adopt the rule that borrows in-house counsel from pursuing wrongful termination claims because their client, my client, has an unfettered right to terminate under the rules of professional responsibility. Counsel refers to a Massachusetts case. It was really a New Jersey case that involved whistleblower statute. My response to that is simply, hey, the only Supreme Court gets to regulate lawyers and their ethical obligations. And it doesn't matter if the legislature enacts a whistleblower act or any other well-meaning statute. If that statute conflicts with Illinois rules of professional responsibility, those rules prevail. And anything inconsistent with those rules does not. Mr. Crowley had an ethical obligation not to represent the university after he was discharged. He cannot sue for reinstatement. That issue is still an issue on remand to the trial court. And he can't sue for post-termination damages consistent with the attorney-client relationship. Are you going to find that case for me? I will find that case for you. For all of us. With that, as I think my cue to sit down, I thank the court for oral argument this morning, for scheduling this case for oral argument so soon after the briefing took place. And we ask you for judgment or for other relief as set forth in our brief. Thank you very much. All right. I want to thank counsel for excellent arguments this morning. The briefs were very well done, very enlightening, and we will take the case under advisement.